IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMUNICATION WORKERS OF AMERICA, AFL-CIO, MARK BELLINI, NORMAN BENNETT, MICHAEL BRACBEN, MICHAEL CALFE, SEAN CLEARY, SHAWN CICIARELLI, JUDY COLIN, BRIAN CROFUTT, RYAN DESLAURIERS, ROBERT DORBRITZ, JAMIE FETTERMAN, RAY GAULT, BARBARA HILLIARD, JUSTIN HILTY, ROBERT IRWIN, JOHN KELLY, ROBERT KISSICK, BRANDON LUSTER, JOHN McANIINCH, JOHN MOCHAN, TRACY MOWER, TED PASKERT, ERIC PASQUERELLA, JOHN RADESHAK, DANIEL SISTEK, JOSEPH SHAW, JARED SOFALY, KEVIN VRUDNEY, and CLAYTON WELLS, Plaintiffs, vs. COMCAST CABLE COMMUNICATIONS, INC. and COMCAST CABLEVISION OF WESTMORLAND, INC., Defendants. | 2:05cv950 Electronic Filing |

## OPINION

Plaintiffs commenced this action seeking redress pursuant to the Employee Retirement Income Security Act ("ERISA") in conjunction with a decision to freeze participation in a defined contribution pension plan and thereafter cease future benefit accruals under the plan. Plaintiffs claim that they did not receive notice of defendants' amendments as required by ERISA and the adopted resolution eliminated benefits expressly protected under the plan. Presently before the court are cross motions for summary judgement. For the reasons set forth below, plaintiffs' motion for partial summary judgment will be denied, defendants' motion for summary judgment will be granted, and final judgment will be entered pursuant to Rule 58 against plaintiffs and in favor of defendants on all counts.

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. National State Bank v. National Reserve Bank, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Electric Industrial Corp. v. Zenith Radio Corp., 475 U.S. 574 (1986) (quoting Fed.R.Civ.P. 56 (a), (e)) (emphasis in Matsushita). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." Harter v. GAF Corp., 967 F.2d 846 (3d Cir. 1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is

colorable or lacks sufficient probative force summary judgment must be granted. Anderson, 477 U.S. at 249-50; see also Big Apple BMW, Inc. v. BMW of North America, 974 F.2d 1358, 1362 (3d Cir. 1992), cert. denied, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

Plaintiffs essentially contend defendants failed to take sufficient steps to provide them with actual notice of the freeze and cessation of benefits as required by ERISA and as a result the freeze and cessation does not apply to them. They argue defendants have produced insufficient evidence to establish that notice to each of the individually-named plaintiffs was placed in the mail and as a result material issues of fact remain for trial.

The record does not reflect material issues of fact at Count One. To the contrary, it is clear that defendants sufficiently complied with the notification requirements under ERISA when participation in the Broadband Pension Plan ("the plan") was closed and all future benefit accruals were eliminated as of December 3, 2002. Defendants timely provided sufficient notice of the cessation of future benefit accruals as a matter of law.

ERISA imposes upon plan administrators an obligation to notify participants of material changes in benefit plans. With regard to pension plans, ERISA provides:

> An applicable pension plan may not be amended so as to provide for a significant reduction in the rate of future benefit accrual unless the plan administrator provides the [described] notice ... to each applicable individual ....

29 U.S.C. §§ 1054(h). Defendants were obligated to provide notice of the cessation of future benefit accruals in accordance with § 1054(h).[1]

Pursuant to statutory authority, the Secretary of Labor has "further amplified" ERISA's notice requirements through the promulgation of a regulation that provides: "the plan

---

[1] ERISA imposes substantially similar notice and disclosure requirements for "material modifications" made to employee welfare plans. See 29 U.S.C. § 1024(b) (1); Lettrich v. J.C. Penney Co., Inc., 213 F.3d 765, 769 (3d Cir. 2000).

3

administrator shall use measures reasonably calculated to ensure actual receipt of material by plan participants, beneficiaries and other specified individuals." 29 C.F.R. § 2520.104b-1(b) (1). Although no particular method of disclosure is mandated, the administrator must choose a method "of delivery that is likely to result in full distribution." Id. Acceptable methods include in-hand delivery, a special insert placed in a periodical distributed to employees, such as union newspapers or company publications, and material distributed through the mail. Id. In certain circumstances an administrator may be obligated to use a combination of methods that when "taken together are reasonably calculated to ensure actual receipt." Id.

It is well settled that the statute and it's accompanying regulations are satisfied by an administrator's selection of a method or methods "reasonably calculated" to reach participants and proof of "actual receipt" is not required. See Custer v. Murphy Oil U.S.A., Inc., 503 F.3d 415, 418-19 (5th Cir. 2007) (the proper focus under ERISA's disclosure requirements is not whether the participant actually received notice, but instead is whether the administrator employed a method of distribution that was reasonably calculated to ensure actual receipt); Crotty v. Dakotacare Administrative Services, Inc., 455 F.3d 828, 830 (8th Cir. 2006) (adopting standard followed by numerous courts that ERISA "does not require proof of actual notice, so long as the administrator has sent the notice by means reasonably calculated to reach the recipient.") (collecting cases in support ); Lettrich, 213 F.3d at 770 ("a plan administrator must notify participants and beneficiaries of material reductions in covered services or benefits by using measures reasonably calculated to ensure actual receipt of material by the plan participants.") (citing 29 C.F.R. § 2520.104b1(b) (1)); Leyda v. Alliedsignal, Inc., 322 F.3d 199, 208 (2nd Cir. 2003) ("the district court properly concluded that this regulation means that the plan administrator must make reasonable efforts to ensure each plan participant's actual receipt of the plan documents.").

The following measures were taken by defendants to send notice to the plan participants of the cessation of all future benefit accruals. Comcast hired AON Consulting to assist in

communications with AT&T Broadband employees in conjunction with the merger of Comcast and AT&T Broadband. AON helped develop the notice and brochure to be sent to participants regarding the freeze of participation and cessation of future benefit accruals. AON contracted with ANRO, Inc., to print and send the notices. Comcast obtained a mailing list of the 41,000 (plus) employees of AT&T Broadband that were plan participants, which contained the most current mailing addresses available. ANRO then received the names and addresses of the plan participants in an excel spreadsheet. There were three separate mailing lists within the spreadsheet. The mailing list for the Communication Workers of America, AFL-CIO ("CWA"), contained the names and addresses of 2,643 individuals, and included the names and addresses of each individual plaintiff. ANRO processed the information on the excel spreadsheet to conform with U.S. Postal Service standards, added the four digit extension zip code where possible, and sorted the addresses in zip code order. ANRO did not remove any addresses from the data base it derived from the excel spreadsheet and mailed the information to every mailing address given to it. ANRO's database for the CWA employees contained the names and addresses of the 2,643 individuals that appeared on the excel spreadsheet, and included specifically the names and addresses of each individual plaintiff. ANRO printed the notice and a "summary of material modifications," printed the names and addresses on the envelopes in zip code order, stuffed and sealed the envelopes by machine, and metered the envelopes for first-class mail. After being stuffed and metered, ANRO placed the envelopes in mail trays supplied by the United States Post Office, tagged them as a specific mailing, filled out the appropriate postal paperwork, and delivered the mailings to a United States Post Office. The notice materials were mailed on November 18, 2002, to each individual listed in ANRO's electronic database. No significant problems were encountered during the course of the mailing nor were there any reports of abnormalities made by Comcast, AON, or the United States Post Office. In total, 40,538 mailings were placed into the United States Postal Service by ANRO , which corresponds with the number of first class mailings billed to and paid by Comcast.

In addition to the above, defendants point to the following additional information to support their contention that ERISA's notice and disclosure requirements were fully satisfied: each individual plaintiff conceded they had no personal knowledge as to whether Comcast actually sent the notice on November 18, 2002, with the exception of Don Mochan, who testified that he knew the notice had been sent because he had the original brochure in his files and had probably received it in or around November of 2002. In addition, two other individual plaintiffs, Daniel Sistek and Jamie Fetterman, stipulated they had received the notices mailed to them on November 18, 2002. Two other employees who worked at the Westmorland location where the individual plaintiffs worked and were members of Local 13000 of the CWA received the notices shortly after they were mailed on November 18, 2002. Finally, another individual plaintiff, John McAninch, admitted that although he did not receive the notice, he thought Comcast had sent it.

Plaintiffs' contention that "defendants [have] submitted no evidence that the notices addressed to the individually named plaintiffs were placed in the mail" is unavailing. Proof of actual notice is not required. Defendants merely were required to employ methods reasonably calculated to ensure actual receipt of the notice. The customer service representative employed by ANRO who coordinated the printing and mailing of the notice testified to the correlating accuracy of the names and addresses on the excel spreadsheet, the ANRO database derived therefrom and the process by which the envelopes were created, stuffed, metered, placed in mail trays, tagged and ultimately mailed through the United States Postal Service. This testimony more than sufficiently establishes defendants' compliance with ERISA's notice requirements. See 29 C.F.R. § 2520.104b-1(b) (1) (" material distributed through the mail may be sent by first, second, or third-class mail."); Crotty, 455 F.3d at 830-31 (surveying cases where summary judgment was granted in favor of a plan administrator because some evidence had been presented tending to show "not only that the employer had a system for sending out the required notices, but also that the system was in fact followed with respect to the person in question."); Degruise v. Sprint Corp., 279 F.3d 333, 337 (5th Cir. 2002) (holding that sending a letter via first class

mail satisfies an employer's COBRA notification requirement under ERISA"); Custer, 503 F.3d at 419 ("the regulations indicate that distribution through first-class mail fulfills the disclosure obligation."); Williams v. Plumbers & Steamfitters Local 60 Pension Plan, 48 F.3d 923, 926 ( 5th Cir. 1995) (recognizing that circumstantial evidence of placing letters in the mail, including customary mailing practices used in the sender's business, through a sworn statement or testimony provides credible evidence of mailing and holding that proof of mailing through such evidence is sufficient to satisfy the obligation to employ methods reasonably calculated to ensure actual receipt); Roberts v. National Health Corp., 963 F. Supp. 512, 514-15 (D. S.C. 1997) (same) (collecting cases in support).

Except as noted above, plaintiffs provided sworn deposition testimony that they never received the notice and seek to establish "the inverse of the mailbox rule's presumption of receipt." Custer, 503 F.3d at 420. In addition, they advance other corroborating evidence of non-receipt in an effort to show the notice was never mailed to them. This evidence includes ANRO's detail mailing sheet indicating 40,570 pieces of mail passed through the postage meter machine with a total mailing of 40,538; the lack of any individual to testify that any particular notice was placed in the mail; Marge Krueger, a CWA employee who was intimately involved in representing union members' interest, received numerous calls from union members at all of defendant's locations other than the Westmorland location in November of 2002 after defendants mailed the notice, but did not receive any calls from the Westmorland location, which she presumed was because those employees were not included in the defendant's decision to freeze the plan and had not received the notice; members of the union team bargaining for a new contract with defendants in 2004 were confused regarding the Westmorland members' status with regard to the plan because the members were not receiving plan statements while other union members at other locations were receiving them, and after they were informed that they were members of the plan and it had been frozen, the Westmorland location members filed grievances contesting the frozen plan.

7

Plaintiffs' additional evidence does not create a disputed issue of material fact. The inquiry before this court is whether the defendants employed a method that was reasonably calculated to provide actual notice of the change in benefits, not whether notice was actually mailed to the specific individually-named plaintiffs. Defendants chose a form of notice sanctioned by the Secretary of Labor's applicable regulation. And unlike Crotty and similar cases which have recognized a material issue of fact where the defendant comes forward only with evidence that it had a system for mailing the notice in question, defendants have come forward with affirmative evidence establishing both a system for mailing the 40,538 notices and affirmative evidence indicating that at least that many notices were actually placed into the custody of the United States Postal Service with proper first class postage. In addition, three of the individually-named plaintiffs concede they received the notice shortly after it was mailed on November 18, 2002, and another individually-named plaintiff admitted that his wife had received a copy of the notice around that time. Both the excel spreadsheet used by ANRO and the database used to produce the mailings contained the names and addresses of the individual plaintiffs. Finally, the fact that 32 additional passes were required on the postage meter fails to provide any affirmative basis to support the proposition that defendants' chosen method was not reasonably calculated to provide actual notice to plan members.

Given the strength of the above-referenced evidence of record, plaintiffs have fallen short of the quantum of evidence necessary to create a material issue of fact on defendants' statutory obligation to provide notice. Permitting plaintiffs to proceed on little more than a direct assertion of non-receipt and weak and tenuous circumstantial evidence to support that assertion "would essentially require proof of receipt on the employer's part where the regulations only require proof of mailing." Custer, 503 F.3d at 421. The courts uniformly have rejected such a proposition where the record contains adequate proof of mailing. Accordingly, summary judgment in defendants' favor is appropriate at Count One.

Plaintiffs' contention that Section 11.5(d) has been interpreted arbitrarily and capriciously

also is without sufficient legal support to withstand defendants' motion for summary judgment. Accordingly, summary judgment must be granted on Count Two as well.

On August 24, 2006, the individual plaintiffs filed administrative claims alleging defendants violated Section 11.5(d) of the plan by closing participation after November 18, 2002, and ceasing all benefit accrual as of December 3, 2002. On November 15, 2006, William J. P. Strahan, Vice President of Compensation and Benefits for Comcast, denied the claims on the grounds that they had been untimely submitted and there was no violation of Section 11.5(d) in any event. The individual plaintiffs appealed this determination on January 11, 2007, and on May 23, 2007, the Investment Management Committee ("the committee") upheld the denial on both grounds.

Pursuant to Section 13.2, the committee retains full discretionary authority to determine the eligibility, status and rights of all persons under the plan and to construe its terms. In light of this discretionary authority, both parties agree that it is appropriate to review the decisions of the committee in accordance with the arbitrary and capricious standard of review set forth in Firestone Tire & Rubber Co v. Bruch, 489 U.S. 101, 114-15 (1989) (where plan administrator has discretion to interpret the plan and the authority to determine eligibility, a denial of benefits properly is reviewed under the "arbitrary and capricious" standard); Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagon of Am., 222 F.3d 123, 129 (3d Cir. 2000) (same). Under this standard:

> A plan administrator's decision will be overturned only if it is clearly not supported by the evidence in the record or the administrator has failed to comply with the procedures required by the plan. A court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.

Orvosh, 222 F.3d at 129.

Plaintiffs assert that a heightened review is appropriate in accordance with the sliding scale approach announced in Pinto v. Reliance Standard Life, Ins., 214 F.3d 377 (3d Cir. 2000). This approach requires the court to consider any evidence that the administrator acted from an

9

improper motive and correspondingly heighten its level of scrutiny to account for the potential impact that any such improper motive may have had. Post v. Hardford, Ins., 501 F.3d 154, 161-62 (3d Cir. 2007). After determining the appropriate level of scrutiny, the court is to review the merits of the decision and the evidence of impropriety together and determine whether the decision in question reflects a proper exercise of the discretion accorded to the administrator. Id. at 162. "At its best, the sliding scale reduces to making a common-sense decision based on the evidence whether the administrator appropriately exercised its discretion. This theme, rather than getting bogged down in trying to find the perfect point on the sliding scale, [is to] be [the] District Court[']s] touchstone." Id.

The heightened arbitrary and capricious review approach requires consideration of both structural and procedural factors. Id. (citing Pinto, 214 F.3d at 392-93). "The structural inquiry focuses on the financial incentives created by the way the plan is organized, whereas the procedural inquiry focuses on how the administrator treated the particular claimant." Id. Structural conflicts arise when the administrator has a non-trivial financial incentive to act against the interests of the beneficiaries. Id. at 162. (citing Pinto, 214 F.3d at 389). Under this prong of the analysis the Court is to consider "whether the plan is set up so that the administrator has strong financial incentives routinely to deny claims in close cases - in short, whether the administrator's incentives make treating it as an unbiased fiduciary counterintuitive." Id. at 163 (citing Pinto, 214 F.3d at 388). The Court is not to get bogged down with the various non-exclusive structural factors that have been identified for consideration and engage in a talismanic undertaking. "Rather, it is [to conduct] a broad-based inquiry into whether the structure of the plan raises concerns about the administrator's financial incentive to deny coverage improperly." Id.

The United States Court of Appeals for the Third Circuit has identified two areas where a plan's financial structure can raise particular concerns: (1) when a plan is funded on a case-by-case basis, Skretvedt v. L. I. DuPont de Nemours & Co., 268 F.3d 167, 174 (3d Cir. 2001), and

(2) when it is funded and administered by an outside insurer, Pinto, 214 F.3d at 390." Post, 501 F.3d at 163. Case-by-case funding is present when the administrator pays claims out of its operating budget, as opposed to segregated money that has been set aside according to an actuarial formula. In such a setting the administrator has a financial incentive to deny claims because each dollar paid out is a dollar out of the administrator's pocket. Id. This concern is compounded when an outside insurer funds and administers plans, because any incentive that an employer would have to see that benefits are paid fairly to its employees is even further diluted. In contrast, where an employer both funds and administers the plan, and pays for benefits out of a fully funded and segregated ERISA trust fund, no structural conflict is present. Id. at 164 n. 6 (collecting cases in support). Additional areas of concern can arise where an employer has little or no self-interest in assuring that benefits are paid fairly, such as where the claim is brought by a former employee or the claim has been processed by an employer who is in financial difficulty.

Where a structural conflict of interest is mitigated by a process that employs independent claim evaluation and there is no evidence of procedural bias, only minimal heightened scrutiny is appropriate. Id. at 164 (citing Stratton v. E. I. DuPont de Nemours & Co., 363 F.3d 250, 254-56 (3d Cir. 2004)). In contrast, where structural bias is not mitigated by independent claim evaluation, additional heightened review is warranted. Id. (citing Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 199 (3d Cir. 2002)).

Under the sliding scale approach it is also appropriate to consider the process by which the administrator arrived at its decision. This prong of the inquiry focuses on whether any procedural irregularity exists that gives rise to suspicion. Id. Non-exhuastive examples included the reversal of a prior position without additional evidence; self-serving selectivity in using and interpreting medical reports; ignoring and disregarding staff recommendations; and requesting additional medical examinations when the totality of the evidence indicates the claim should be paid. Id. (citations omitted).

The focus in considering procedural factors is on whether the administrator has provided

11

reason to doubt its fiduciary neutrality.  Id.  If it has, additional scrutiny is warranted.  In contrast, if there are irregularities but they are minor, only few in number, and not sustained, then such minor glitches may reflect nothing more than trivial carelessness.  Where, however, there are marked deviations from the procedural norms that are routinely followed, questions about neutrality necessarily are raised.  Id. at 165.

In support of a heightened review, plaintiffs note the plan was sponsored and administered by Comcast Cable Communications Holdings, Inc., the parent company of Comcast of Pennsylvania, Inc., the successor of Comcast Cablevision of Westmorland, Inc.  In addition, plaintiffs challenge a decision by defendants concerning an amendment that called for a freeze in participation and cessation of future benefit accruals.  A decision that the cessation was not effective as to the individual plaintiffs would result in a deficiency in the funding of a defined pension plan, which in turn would obligate defendants to fund any deficiency.  Thus, the plan administrator did have a financial incentive to deny plaintiffs claims, because any decision to the contrary would require direct additional funding by defendants.  There are no procedural irregularities to be considered.

Structural conflicts of interest warrant a more searching review.  Post, 501 F.3d at 164.  But as a general matter structural conflicts alone warrant only a moderately heightened review.  And in the absence of evidence reflecting bias in the particular decision at issue, deference is still to be given to the administrator's decision under such moderately heightened review where the administrator's conclusions appear to be reasonable and carefully considered.  Id.  (citing Orvosh, 222 F.3d at 129).

Plaintiffs' claims sought to establish that defendants wrongfully denied the accrual of future benefits after December 3, 2002, because the section of the plan applicable upon a "Change in Control" precluded such action.  In advancing this position plaintiffs rely on the following version of Section 11.5:

> 11.5 Change in Control

> (a) As of the date an Eligible Employee terminates employment (The Employee's "CIC Termination Date"),
>
>> (1) the Eligible Employee shall be one hundred percent Vested in his Accrued Benefit; and
>> (2) all unbridged Term of Employment and other service of the Eligible Employee shall be bridged, provided that the unbridged Term of Employment or other service otherwise would have been eligible for bridging under the rules of this Plan.
>
> (b) As of the last day of the month in which a termination due to a Change in Control occurs, each Eligible Employee shall have credited to his Cash Balance Account a special credit (the "Special CIC Credit") in an amount equal to the Eligible Employee's Eligible Pay for the calendar year immediately preceding the calendar year in which the Change in Control occurs, multiplied by the lesser of;
>
>> (1) five percent for each whole year of the Eligible Employee's Service as of the last day of the month in which a termination due to a Change in Control occurs, or
>>
>> (2) one hundred percent.
>
> (c) For purposes of this Section 11.5:
>
>> (1) "Eligible Employee" shall mean an Active Participant who within two years following a Change in Control has his her employment involuntarily terminated (other than for "cause" as defined in the AT&T Broadband Severance Plan) or terminates his employment for Good Reason
>
> (d) Notwithstanding any other provision of this Plan, no amendment resulting in a suspension, modification resulting in less generous benefits, or elimination of benefits under this Plan applicable upon a Change in Control may be made during the two year period following a Change in Control ....

Plan at Section 11.5. None of the individual plaintiffs sought or requested Change in Control severance benefits as part of the claims under consideration. Instead, they advanced below and maintain in this court that subsection (d) is to be read as a restriction on all benefits under the plan and any contrary interpretation violates the arbitrary and capricious standard.

Defendants denied plaintiffs' claims on the grounds that Section 11.5(d) was applicable only to those benefits designated within Section 11.5 to arise upon a change in control, which are commonly understood to be "Change in Control benefits." The initial denial of plaintiffs' claims

was made with the following explanation:

> Section 11.5(d) prohibits the reduction of those benefits specified as a "Change in Control Benefit" for certain "Eligible Employees" for a period of two years after a change in control has taken place. It does not prohibit the reduction of benefits in general. A "Change in Control Benefit" is one of those benefits set forth in subsections 11.5(a) and (b) of the Plan. They are benefits to which an Eligible Employee is entitled when he or she is involuntarily terminated other than for cause, or when an employee terminates employment for good reason. Thus, according to Section 11.5(d), Comcast cannot amend such Change in Control Benefits for a period of two years following its assumption of control.
>
> Section 11.5(d) does not, however, apply to or condition Comcast's authority to alter benefits discussed in other sections of the Plan. The limitations on Comcast's authority to amend or change other benefits in the Plan are stated in Section 11.4. Section 11.4 is entitled "Amendment by the Plan Sponsor." It states "[a]mendments may modify the rights and interests of Employees who are Participants in the Plan at the time thereof as well as future Participants but amendments may not diminish the accrued benefit (as defined in Section 411(d) (6) of the Code) of any Participant as of the effective date of such amendment."
>
> The claims here assert that the cessation of benefit accruals and closure of participation in the Plan violated Section 11.5(d). The prohibition in Section 11.5(d), however, was not violated because the changes that were made did not alter the "Change in Control Benefit" provided for in Section 11.5. The benefits that are claimed to have been suspended and modified are provided for in other sections of the Plan and, therefore, they are not subject to the restrictions of Section 11.5(d).

Initial Denial of November 15, 2006. In upholding this denial, the Committee reasoned that if it "were to adopt the claimants' broad interpretation of Section 11.5, the text of Section 11.4 would be read out of the Plan and rendered meaningless." Investment Management Committee's denial of May 23, 2007.[2]

---

[2]Defendants contend that Section 11.5(d) was amended, to take effect in January of 2002. Notwithstanding this action, the amendments to Section 11.5 were inadvertently omitted from the amended and restated version of the Plan that became effective on July 30, 2003, and were once again omitted in the version provided to plaintiffs upon their request in the Spring of 2005. Although defendants maintain that the unannounced and undisclosed amended version of Section 11.5(d) was and remains controlling, it has construed both versions of Section 11.5(d) to have the same meaning and has denied plaintiffs' claim under both versions of Section 11.5. Because the court has concluded that defendants' denial must be upheld in any event under the original

Plaintiffs maintain that Section 11.5(d) must be read to protect two distinct groups of plan benefits. They contend the first phrase protects all benefits contained within the plan from any suspensions or modifications that would result in less generous benefits within a two year period following a change in control. The second phrase protects the "Change in Control" benefits from being eliminated during the two years following a change in control. Plaintiffs assert that the cessation of pension benefit accruals constituted not only a suspension of the plan, but also a modification of it which resulted in less generous benefits. Because any such suspension or modification was precluded by the first substantive phrase in Section 11.5(d), defendants' actions were in violation of the express provisions of the plan and any interpretation to the contrary was arbitrary and capricious. Plaintiffs base this interpretation on the placement of the conjunction "or" within the first sentence of Section 11.5(d), as opposed to the use of the conjunction "and", which purportedly necessitates reading the substantive phrases in the disjunctive.

Plaintiffs' interpretation does not reflect an ordinary and natural construction of Section 11.5(d). While the conjunction "or" is often used to introduce the second of two alternatives, it is also commonly used to designate only the last of any number of alternatives. See The Oxford Dictionary and Thesaurus, American Ed. 1996. A reading of the first sentence of Section 11.5(d) with the conjunction "or" being used in the latter manner makes perfect sense. When used in that context, the first sentence prohibits any amendment, negative modification or elimination of benefits applicable upon a change or control. Such a reading also properly acknowledges the limitation of benefits to those "applicable upon a change of control." This reading also finds support from the placement of the prepositional phrase "of", which naturally follows each of the three clauses that proceed it, i.e., the suspension, modification or elimination "of benefits ... applicable upon a Change of Control...."

Where a plan has vested discretion in the administrator to construe the terms of the plan,

---

version of Section 11.5(d), it need not resolve the issues presented by defendants' failure to provide notice of the June 2001 amendments to Section 11.5(d) until after this litigation was commenced.

"a plan administrator's interpretation of a plan may be disturbed 'only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Courson v. Bert Bell NFL Player Retirement Plan, 214 F.3d 136, 142 (3d Cir. 2000) (quoting Abnathya v. Hoffmann-LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)). It can not be said that the administrator's interpretation of Section 11.5(d) was without reason or erroneous as a matter of law. The interpretation rendered by defendants is supported by both a natural and ordinary reading of the first sentence in Section 11.5(d), and is further supported by both the context of Section 11.5 as a whole as well as the preamble thereto.[3] As such, the administrator's interpretation is entitled to deference even under the heightened standard brought into play by the structural conflict existing when the interpretation was rendered.

An alternative interpretation of Section 11.5(d) does not warrant a ruling that the chosen interpretation is without reason or erroneous as a matter of law. See Edwards v. Wilkes-Barre Pub. Co. Pension Trust, 757 F.2d 52, 57 (3d Cir. 1985) (where the administrator's interpretation of a plan is sensible and faithful to the plan's actual language, a plausible alternative interpretation does not render the challenged interpretation arbitrary or capricious, because "it is for the [administrator], not the courts, to choose between two reasonable alternatives."); Retirement and Sec. Program for Employees of Nat. Rural Elec. Co-Op., 712 F. Supp. 223, 227 (D. D.C. 1989) ("ERISA ... only requires [administrators] to make a reasonable choice among possible alternatives.") (quoting Foltz v. U.S. News & World Report, 663 F. Supp. 1494, 1519 (D. D.C. 1987), aff'd, 865 F.2d 364 (D.C. Cir. 1989)). This principle has particular force here where the plan administrator's interpretation is supported by both the context in which the language in question appears and reflects the more natural reading of provision in question. As a consequence, the Plan administrator's interpretation cannot be disturbed and defendants are entitled to summary judgment at Count Two.

---

[3]The preamble provides: "Section 11.5 of the Plan shall continue to apply to individuals who are active participants on November 18, 2002, who otherwise may qualify in the future for an additional change in control benefit."

For the reasons set forth above, defendants are entitled to summary judgment on all counts. Accordingly, plaintiffs' motion for summary judgment will be denied, defendants' motion for summary judgment will be granted, and final judgment will be entered pursuant to Rule 58 against Plaintiffs and in favor of Defendants. Appropriate orders will follow.

<u>Date: March 12, 2008</u>

<u>s/ David Stewart Cercone</u><br>
David Stewart Cercone<br>
United States District Judge

cc:     Michael J. Healey, Esquire
        Douglas B. McKechnie, Esquire
        The Pennsylvanian, Suite C-2
        1100 Liberty Avenue
        Pittsburgh, PA 15222

        Kay Kyungsun Yu, Esquire
        Pepper Hamilton LLP
        3000 Two Logan Square
        Eighteenth & Arch Streets
        Philadelphia, PA 19103

        Kristy L. Rizzo, Esquire
        Pepper Hamilton LLP
        500 Grant Street, 50th Floor
        Pittsburgh, PA 15219